Thank you. Good morning, your honors. My name is Martha Hall. I represent Mr. Farias, the appellant in this case. The argument I would like to start with is the argument regarding the deportation. And it's our position that the deportation is invalid and cannot satisfy that element of this criminal prosecution based primarily on this court's decision in the United States v. Arias Ordonez. Let me ask you a question which is a little bit off the point but which is of some worry to me. Has your client been released from prison yet? No, he's not due to be released I believe a year from now. December 28, 2013? Correct. Okay, I just wanted to make sure because I had some idea that he might be out and yet I thought he was supposed to be released then. My understanding is he's still in prison. I haven't done a recent check, but my understanding is that he's still in prison and his release date is 2013, December 2013. All right, thank you. Ms. Hall, going back to your Arias argument, in Arias the notice was improper because it said you have no further administrative relief, right? Correct. And that was improper because he did have further administrative relief. He could have made a motion to reopen, and that's what you claim happened in this case, right? That's correct. Isn't that sort of undercut by the claim that he never received the notice? Those are two different notices. The notice he claims he did not receive was the notice back in 1998, the notice of his actual hearing on his request for cancellation of removal. He does not deny that he receives the notice telling him he's going to be removed. That was delivered to him, I believe, in 2008 when he was encountered and interviewed by the immigration officials, given the notice saying,  And that's the notice you say carried the defective Arias notification. That's correct. And does your client say that he read that notice? And if so, could you give me a record citation? Well, let me just cite you first to the actual notice. That notice is at the excerpt of record at page 178. There was no affidavit with regard to that notice, but there's no indication that he either didn't read it or didn't understand it. Did he ever claim to have read it? And did he ever say, Under oath, I read this? Did he ever submit a statement? Because his claim is that he was misled, and it's very difficult to mislead somebody without hearing it or reading it. I believe that the Arias court referred to a misreading. Would you answer my question? Yes. There's nothing in the record. There's no record evidence that he ever read it, right? There's no record that he ever read it. However, at page 180 of the – I believe that it's 180 of the ECR. There is the report. I believe that that's the report. I have not carefully examined that. But I believe that that's the report indicating that he was interviewed by the officer and given the notice. No, pardon me. 178 is the 1998 notice, which he said he never received. What is the one that you say he received in 2008 and which is irrelevant, whether he read it or not? I don't believe the notice at 178. I'm reading it here. October 14, 1998. It's a notice to Farias, and it says, a review of your file indicates there is no administrative relief which may be extended to you. That is a 1998 notice. That's the one he said he never received. Now, which one was the 2008 notice that you were telling me about? This is the one which I believed was submitted to him in 2008, and I apologize if I got the dates wrong. Straighten that out for me. Would you please give me a citation of the 2008 notice, which has the same language and which you say he had? I apologize, Your Honor. Pardon me. I believe that this was delivered to him in 2004 because the report immediately follows. Wait a minute. Now we're at a different date. I apologize. All right. Now, you say 1998, no receipt. 2008 was a mistake. 2004. Now, give me a citation to the notice or any other proof that indicates that Mr. Farias read this IDS language in 2004, if you would. I have nothing to say he read it in 2004. I have the report of the officer saying he met with him in 2004. That's immediately following the actual notice. I'm really confused about your argument and the dates of these notices. All right. We have, in 1998, he's served with an order to show cause why he should not be deported. He received that notice. The initial one, yes. He shows up. They have the hearing continued several times. No, but he claims he never got that notice. Initially, he was in custody. He was in custody. In 1998, he was in custody. He receives an order to show cause why you should not be deported. His family retains an attorney. He is released on bond, and he signs the bond form. His attorney, back in 1998, his immigration attorney, files a motion to change venue. The court grants it, resets a hearing in San Diego, and it's notice of that reset hearing that he claims not to have received because that was sent to the wrong address. This is all back in 1998. His attorney shows up for the deportation hearing. Mr. Farias is not present at the deportation hearing in 1998, and the immigration judge at that point issues an order of deportation. Okay. But isn't our case law that it's sufficient to serve notice on the attorney? That's the immigration case law, and that was the focus of the deportation hearing, of the attack of the deportation hearing initially. However, I think Arias-Ordonez makes it clear that based on this order that he received, his order advising him that he's going to be removed. Well, if he never read it, how did he ever know about it? We have the report at 180, which indicates that he was interviewed by an INS official. When was this? That, I believe, is in 2004. I think what happened is that they came and ---- I mean, the problem that I have with your argument is that his attorney files a motion for change of venue. He files the motion. And in the motion, there's an address. In that address, it isn't correct. But nonetheless, the client knows what the attorney's filing. He has at least 10 days in order to contact his attorney and say, hey, you got the wrong address before the notice comes out. Didn't he contact his attorney and say his address was wrong in the motion? I mean, the attorney filed the motion. We have no evidence either way of what happened there. So then at that point, his attorney gets the ---- as I understand it, he's out on bond. His attorney gets notice. There isn't any case which says that's not sufficient, except that you're suggesting that he might have read something that was bad. But his attorney files a motion for a change of venue, puts the address in the notice. Nobody tells anybody that that address is wrong. He doesn't contact his attorney. And now I'm to say he didn't get the notice. I want to try to clarify the confusion. There's the notice of the deportation hearing in 1998. That's the notice that was discussed primarily below and in the opening brief. And then there is the notice that you are to be removed and you have no further options. That's the order of deportation. Right. It's ---- I believe it's a little bit different than the order of deportation. Well, it says down at the bottom, if you leave the United States of your own accord, this order of deportation ---- that's why I call it an order of deportation. Right? Now, that ---- That's at page 178. That is ---- that's different from anything that happened in 1998. This was a notice ---- But it happened in 1998, October 14. That's what it says right at the top. I understand that. That might be the date that this was produced. But this was served on the defendant, I believe, in 2004. Why do you believe that? That is the ---- that is the report on the record on 180. ER-180. There's a report. I don't have ER-180 here. Could you tell me exactly what it says that shows that this order of deportation was served and read by Mr. Farias, so therefore he was misled along the same way that Mr. Adias was. That's what I'm after. The report at 180 is what's entitled, A Record of Deportable Inadmissible Alien. It indicates that in 2004 he was encountered. The subject had been declared removed by an immigration judge in San Diego, California, on October 7, 1998. The subject has been in law enforcement custody since that order was handed down. The subject claims no fear of being returned to his native country. CIS. It's in the record on page what? 180. And what is there in there that says he read that? It does not say he read it. This is a report that is signed by a deportation officer. Does he sign it any place? The deportation officer signed it. No, the deportation officer, but I mean your client. No, my client. How do I know your client saw this by what I have here on 180? What part of it says he saw it? I don't believe that there's anything in there particularly that says he saw it, he read it. You know, counsel, you have used up almost all your time with, like, misleading comments about when the notice was received and statements of the law, and it seemed to me your opening brief was all about that he didn't receive the notice. You didn't bring up ARIAS until the reply brief. So you probably waived that argument anyway. And you haven't even addressed the mental health issue, which is the main reason we're sitting here today, is to address that. I certainly apologize, Your Honor. It's never been my intent to be misleading at all. I would note in the opening brief at pages 49 and 50, we did refer to his lack of understanding of the ability to move to reopen or to exhaust remedies. That is in the opening brief. ARIAS we did not bring up until the reply brief. You're correct. It's my belief that ARIAS is controlling and does compel a decision in his favor. I would like to address any questions you have on the competency issue. Is the reason you're not addressing whether or not it was proper to commit ARIAS without a hearing under section 42, 41, is because there's really no remedy for that? I believe that the remedy is difficult. There's no remedy. There's no statutory remedy. Our argument is that there should be a remedy. If there's a right, there should be a remedy. What would the remedy be? I believe that the appropriate remedy is a dismissal. I think that's the only remedy that could address this particular injury, and we analogize it to the speedy trial type injury. And in this case, if the requirement of a competency hearing is for the protection of the incompetent defendant, right, so he won't have to go to trial if he's incompetent. Well, I think that there are two. Correct? I believe there are two protections. I believe that the competent person should be protected against being placed in a mental institution as much as the incompetent. But you don't claim he was competent. You claim he was incompetent. I never claimed he was incompetent. Well, he was held for a period of treatment. Then he was reinstated as competent. I don't think the record does not indicate any treatment. The report from FMC Butner does not detail any treatment. He basically was returned to San Diego in the same state that he arrived at FMC Butner. And that was, by all accounts, belligerent, obstreperous, but competent. Judge Burns initially in, I believe it was December, indicated that it was his impression that the defendant was competent. If Judge Burns had had a competency hearing and your man had been found competent, he would have gone to trial. Earlier, yes. And is your claim that the difference between that earlier trial and now is a period of time for compensation monetarily or that he should get a reduced sentence? What is your claim? My claim is the injury is similar to the injury in a speedy trial case, and that is that he languished for almost three months at the MCC in San Diego with no work being done on his case. And then he was sent 2,500 miles away to a mental institution. But didn't he join in request to delay the competency hearing? I mean, the competency evaluation? His attorney did sign off on the request to delay. Mr. Farias was never present for any hearing on any of the requests for the delays. And based on his statements in court, I think it's fair to infer that he would have objected because he objected. He specifically stated in January when the judge said, I'm shipping you out, he said, you know, don't send me away from San Diego. I can see a psychologist here. Don't put me in a mental institution. I want to call my mother. I want to call, you know, my lawyer. There is a problem in that the hearing, there's several problems with this. The hearing that was held that was allegedly the hearing to satisfy the statute was to determine whether he should be evaluated as to whether or not he was competency. But the written order that Judge Burns issued not only provided for evaluation, but it went further. It ordered hospitalization for treatment in a suitable facility. And that's why he was sent to Springfield, was for that. And I agree with you that Judge Burns erred by not holding a hearing and also that your client was objecting. And not only that, the only real evidence, non-hearsay evidence, that Judge Burns had in front of him from Dr. Kalish was an opinion that he was competent. So basically Judge Burns sent away a competent person for treatment to Springfield based on all these transcripts. And the problem is I don't think you cite a single case that says that there is any remedy for that. I don't think there's any remedy for that at all. I mean, in the way you argue it, I mean, I'm trying to, you know, think beyond this case to the next case. I mean, is this a due process violation? Is this, you know, if this, that scenario is true, what would you, I mean? I think the closest that I could come to directing you to a specific place for a remedy is the Sixth Amendment requirement for a speedy trial and the analogy to the Speedy Trial Act. Certainly by suspending the proceedings improperly for what amounted to six months, there is a concern there that the right to a speedy trial has been impeded and violated. But you'd agree, I guess, that 18 U.S.C. 4241 doesn't provide me any remedy. It does not provide a specific remedy. And nothing relating to it in that section provides me a remedy. I believe that's correct. And so there at that point, if I produce a remedy, it's simply because I've got to come up with some right that would be appropriate with some other right you're so arguing. Is that it? I mean, my worry about the whole thing is it seems to me the remedies are pretty well outlined in the law. And I know what remedies I have. And now we have a situation where you want me to whole cloth make one. If the Congress wanted me to have such a whole cloth make a one, they'd have made one myself. Why should I, as a judge, make one? Well, because there should not be an injury without a remedy. Well, it could be. They'd just come back and have the hearing again. Actually, you know, in similar cases, I think most recently the Lochner situation, what the attorneys did there was petition for Nandamus to get the order of commitment reversed immediately. That was the remedy that we heard several times in that case. I believe that that is a remedy and an option at the time. But here was why wasn't anything done at the time? Maybe he has a cause of action against his attorney. Or maybe his attorney is ineffective and then we have a problem because he has ineffective counsel. Well, it didn't seem at the point where he was actually committed that his counsel was conducting himself in accordance with his desires. That's correct. And I think that's one of the reasons that the 4241 has mandatory language directed at the judge, because in these circumstances there is usually some tension between the defendant and the defense attorney. And so it is incumbent upon the judge to carry out the procedures that are mandatory under 4241 and 4247. All right. Well, you're well over your time, so thank you very much, counsel. And we will hear from Mr. Manahan. That's correct, Your Honor. George Manahan of the United States. May it please the Court. Regarding the competency issue, the question for this Court is whether on plain error review this Court should find that Judge Burns was required to hold a separate hearing before he found Mr. Farias incompetent, when indeed it was his attorney asking for him to be found incompetent. Let's break that down. Okay. Is it really plain error when Mr. Farias himself was objecting and he had an attorney sitting there who was not representing his interests? It is plain error review, because the attorney was doing what he thought was in Mr. Farias's best interest, because it's obvious that his attorney felt he was incompetent. So it doesn't matter that an incompetent person is telling you, hey, I am incompetent, especially given the outrageous behavior he had been. Well, and I have to say Judge Burns's behavior was almost on par with Mr. Farias's. Is he incompetent? That's not before this Court, Your Honor. Yeah, right. It's a good thing, huh? Anyway, so assuming I don't accept plain error review, assuming I'm going to say that there was an objection made, just assume that for purposes of this question. I understand. What would the standard, correct standard of review be? It would be abuse of discretion. Now, that's what I thought until I have a really, really super smart law clerk who said you could apply abuse of discretion to a place where you have a discretion, where the judge is exercising discretion. But in this case, was he actually engaged in an exercise of discretion? Judge Burns exercised his discretion in finding that there's a preponderance by a preponderance of evidence Mr. Farias was incompetent. So to review that decision, that would be an abuse of discretion. I suppose if you're taking a step back and saying what about the procedures he used to get to that point where he's deciding whether he's incompetent by a preponderance of evidence or not, that would be an issue of law, which if it was properly preserved, maybe de novo review here it was not. Well, can Judge Burns find that he was incompetent without a competency hearing? There was a competency hearing. It just happened to be the same hearing in which competency first brought up. No, no. There was a competency hearing, and that's when Dr. Kalish put in his opinion that Mr. Farias was competent. To be clear, two different attorneys made motions before the Court for Mr. Farias to be found incompetent. The first attorney, the first defense attorney was Hanif Khori. He felt Mr. Farias was incompetent, so he made a motion. That was the point months before January 3rd where Dr. Kalish initially said, yes, he is competent. Now, it's very important what Dr. Kalish said. Dr. Kalish says, you know, this is a, and I'm not quoting, but he's basically like, this is a tough case. He has issues, but I think the real issue is his relationship with Mr. Khori. So I think he's competent. Just give him another attorney and that should fix the issue. That didn't fix the issue because after Mr. Farias was appointed attorney, handpicked for his ability to deal with difficult clients, the same exact issues were coming up again. He couldn't help in his own defense. The second attorney, defense attorney, would say, I asked a simple question like how can I help you. And he starts ranting for ten minutes and the kind of things we see in the record, ranting about homosexuality and ranting about conspiracy theories. I think the record is so strong that I can't. Let me just ask you, but the question in the second hearing was whether he should to the Bureau of Prisons for an evaluation to determine competency, wasn't it? I don't think so, but I do agree that Judge Burns didn't use the clearest language. There was the term exam used, but if you read the. It was all about evaluation for competency. The whole hearing, I've read the whole transcript. Now, maybe, I don't know, maybe you were there and so you have a different sense of the proceeding, but from reading the transcripts. And then, so at most, that's what he failed to object to. He didn't have a chance to object to the order hospitalizing him for treatment. He had plenty of opportunity to object to that. First of all, it was clear that Judge Burns was sending him to Springfield, Missouri for confinement because that's exactly what Judge Burns said. Tell me where he says that. It's on page 64. Is it excerpt 64? It is excerpt 64, line 8. I am going to send you to Springfield, Missouri. Defendant, I don't need to go to Springfield. The court, I am. I'm going to order that you go there for an evaluation. For an evaluation. And he does keep saying evaluation. So that's what he's talking about, evaluation. Why are you trying to? Because he can't, I mean, because I think the reason Judge Burns kept using evaluation because even though. Because that's what this was about. No. He's saying that Judge Burns actually uses words that he doesn't know what they mean and he uses them wrong. No, I'm not. No, I'm not. Because he says evaluation under 4241 over and over. He does. And I think the reason he does that because even though he found by preponderance of evidence that Mr. Farias was incompetent, he was also thinking like, you know, he may be faking it, which, by the way, that's exactly what they found. They found that Mr. Farias was lying the whole time trying to convince the court and everyone else that he was incompetent. Okay. Right. Right. He was a competent person who was confined for six months when he shouldn't have been. He was a competent person pretending to be incompetent very well. Well, he was. But through multiple outrageous acts. Well, okay. And I could list them for you if you'd like. No, I know what they are. I've read the whole transcript. And as I said, I don't know if Judge Burns was exactly handling this very well either. But the point where defense counsel, Mr. Boson, had multiple opportunities, even granting the argument that, well, maybe Mr. Boson was confused and he thought he was just getting the 30-day confinement, even though there's no way he's going to Springfield, Missouri for the 30-day confinement. But taking that argument on its face, let's say that Mr. Boson was confused. Three days later, there's a written order that makes very clear what happens. Right. And at that point, I think that's right. And at that point, I think there should have been a petition for a written order. And not only did he not object, twice Mr. Boson joined in on a motion to push off the date to file the motion because the marshal just couldn't get him to the right prison. Moving on to the 1326d issue, unless there's any further questions on the competency. Now, I just think this is a very problematic situation. Let me just say, Your Honor is correct that the appropriate remedy is a mandamus brief to get him out of confinement. Let's talk about that issue. What is the appropriate remedy? Sure. And that's on page 34 of my brief, footnote 17. And this is the second certain case of the United States v. Magasuba, which clearly indicates the correct remedy for 4241 violation is a writ of mandamus ending the confinement. Now, why didn't that happen in this case? It's clear because Mr. Boson was convinced his client was incompetent. So on the next case, it just goes the whole thing.  I'm just going to say that if everyone was in agreement that Mr. Farias is incompetent, except for Mr. Farias. No, except for Dr. Kalish. That's not correct. Mr. Boson's ---- You're going to tell me about a phone call that didn't even ---- There was no testimony. There was a phone call to defense counsel that he reported, and that's the preponderance of the evidence? There is no reason why Judge Birx could not consider Mr. Boson's statements that Dr. Kalish changed his mind after he was told about the outrageous behavior that he was ---- Dr. Kalish, don't you agree it would have been better if Dr. Kalish had come in and testified to that? Well, Dr. Kalish did follow up with a report basically saying the same thing. Right. But at the time that he was committed for treatment, there was not a report to that effect before this judge. There was an oral report of Dr. Kalish's finding. A statement by the lawyer who wanted his own client committed reporting that Dr. Kalish had said something. I know. But, you know, it's really not that ---- it's understandable how Dr. Kalish was able to quickly come to that conclusion. Dr. Kalish did meet with him. He examined him and said, look, this is a close case, but I think the problem is he just really hates this Hanif Akhori defense attorney. If you just give him a new attorney, the problems will go away. But they didn't go away. They got worse. And so it's very easy for Dr. Kalish to say, well, I guess it wasn't Hanif Akhori. It must be Mr. Fares. Boy, I would hate to see what Judge Burns would have to say about us if we sent this case back to him again. Moving on to the 1326d motion. Again, Your Honor was correct when you pointed out that defendants makes for the first time makes the argument that arias, that, well, there's this notice and so we're home free. Now, I want to make clear, that only applies to one of the three independent reasons why the 1326d motion should fail. First of all, there was adequate notice. Secondly, he's to this day, even though he can at any time challenge his interstitial removal, he still hasn't done it. And that's the one where they try to use the notice. He could do a motion to reopen, right? He can at any time. And third, he is an aggravated felon. Well, we're not sure because that's a question of first impression. It is, Your Honor. But basically, the main argument that the defendant tries to make is, well, and the crime is displaying a firearm in a threatening manner. In a moving vehicle. In a moving vehicle. And the defendant says, well, maybe you could do that negligently. And that's just, it doesn't comport the law. It's obviously an intentional act to pull your arm to threaten someone. Unless there's any further questions, I'll submit. All right. Thank you very much, counsel. I think we'll submit this case. And I thank both sides for their argument, animated arguments today.
judges: Wardlaw, Bea, Smith